Filed 6/18/14  P. v. Sepulveda CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH LUIS SEPULVEDA et al.,<br><br>    Defendants and Appellants. | B237008<br><br>(Los Angeles County<br>Super. Ct. No. BA344081) |

        APPEAL from judgments of the Superior Court of Los Angeles County,
Robert J. Perry, Judge.  Affirmed in part, reversed in part, and remanded for further
proceedings.

        Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and
Appellant Joseph Luis Sepulveda.

        Richard A. Levy, under appointment by the Court of Appeal, for Defendant and
Appellant Gustavo Alvarez.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney
General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Theresa A.
Patterson, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants, Joseph Sepulveda and Gustavo Alvarez, appeal their convictions for first degree murder, with financial gain and lying in wait special circumstances, and with a firearm use enhancement (Sepulveda only) (Pen Code, §§ 187, 190.2, subd. (a)(1), (15), 12022.53).[1] Alvarez was sentenced to life without possibility of parole. Sepulveda was sentenced to life without possibility of parole plus 25 years to life.

The judgments are affirmed in part, reversed in part, and remanded for further proceedings.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

a. *The troubled marriage of Alvarez and Virginia.*

Defendant Alvarez had served on a U.S. Navy submarine until a too-rapid dive caused his eardrums to rupture. The Navy gave him a disability discharge. Alvarez subsequently worked as a telephone technician for AT&T. Virginia and Alvarez were married in 1996 and they lived in Pico Rivera. They had one son together and Virginia had a son from a former marriage. At the time of her death in 2003, Virginia was working as a secretary to the head of the Los Angeles County Sheriff's Internal Affairs Bureau.

In early 2001, Alvarez began an affair with Deanne Joe, a coworker at AT&T. Joe testified that, by April 2001, Alvarez had moved out of his house and was living on his boat. Asked if Alvarez had said anything about his marriage, Joe testified: "Just that he wasn't happy, that [Virginia] seemed to be overbearing. And the example that he used is that he had to ask permission to make a sandwich if you were hungry." Joe broke up with Alvarez in June 2002 when she learned he was dating another coworker.

---

[1] All further references are to the Penal Code unless otherwise specified.

Alvarez and Virginia separated in June 2001 and filed for divorce citing irreconcilable differences. Alvarez initially believed the property settlement would be straight forward. He told Joe he had quitclaimed the Pico Rivera house to Virginia and was willing to turn over a portion of his AT&T salary, but he expected to be able to keep all of his $2519 monthly Navy disability pension. Alvarez subsequently told Joe the divorce proceedings were no longer simple "because [Virginia] was going after his income with AT&T, as well as the Naval pension"

Virginia had apparently been unaware of the Navy pension until they began preparing the divorce paperwork. At an October 2001 meeting with Virginia and the attorney they had hired to file the divorce papers, Alvarez accused the attorney of having discovered his Navy pension and told Virginia about it. He got up and walked out of the attorney's office. Thereafter, Alvarez and Virginia began filing separate divorce pleadings, vigorously contesting child custody, visitation rights, property division, Alvarez's assets, and child and spousal support.

Toward the end of 2002, however, the couple reconciled and divorce proceedings were halted.

b. *The murder plot and the shooting.*

Defendant Sepulveda had known Alvarez since they were kids growing up in Highland Park. Sepulveda was still living in Highland Park in 2003, sometimes staying with his aunt and uncle, Sandra and Vince Hernandez, and sometimes living on the streets. During the first half of 2003, Alvarez visited Sepulveda at least three times. On one occasion, Vince, who knew Alvarez but had not seen him for almost 10 years, answered the door. Alvarez said he was looking for Sepulveda, whom he asked for by his nickname Pee Wee. When Vince said Sepulveda wasn't home, Alvarez retrieved a 12-pack of beer from his car, gave it to Vince and then left without saying why he wanted to see Sepulveda. Sometime later, before Virginia's death, Vince asked Sepulveda what Alvarez had wanted. Sepulveda said Alvarez "was looking for someone to . . . murder his wife." Sepulveda said Alvarez had taken him to a marina where his boat was docked,

3

and that Alvarez's wife had a big insurance policy. Vince told Sepulveda not to get involved.

Sandra Hernandez testified Alvarez came to her house in 2003 to meet with Sepulveda at least twice before Virginia's death. Sandra did not hear what they were talking about either time.

Jennifer Barreau was originally charged with murder in this case, but she agreed to testify after pleading guilty to voluntary manslaughter and receiving a 12-year term. In 2003, when Barreau was in her early 20's and living with her family, she was addicted to methamphetamine and used it every day. She began dating Sepulveda, who was then living with Vince and Sandra three houses away. Initially, Sepulveda sold Barreau drugs, but then their relationship became romantic.

On July 5, 2003, Barreau went to the Hernandez house for a barbeque. When she asked Sepulveda for methamphetamine, he said he could obtain some from a friend. They left in Barreau's car 30 or 45 minutes later. Sepulveda had a shotgun with him. After Barreau drove for a while, Sepulveda told her to stop in the back of a restaurant parking lot which "smelled like Mexican food." Sepulveda had her back into one of the parking spaces so they would be able to see when his friend arrived. Shown photographs of the crime scene, Barreau pointed out where she had parked her car. After 20 or 30 minutes, a dark green SUV drove into the parking lot and stopped. Sepulveda announced his friend had arrived. Barreau could see that a man was driving the SUV. Sepulveda exited Barreau's car with the shotgun under his jacket. Barreau saw him "walk[ ] around the back of the SUV to the passenger side." Then she heard a loud boom like fireworks. Sepulveda returned to her car and the man driving the SUV stepped out of the vehicle. Sepulveda frantically instructed Barreau to drive off, telling her to go through red lights. Then he had her drop him at a friend's house a short distance away.

Barreau went back to the Hernandez barbeque by herself. Sepulveda returned to the barbeque 10 or 15 minutes later without the shotgun. He did have some methamphetamine, which he shared with her.

4

Several customers leaving the Villa Sombrero restaurant witnessed the shooting and identified Sepulveda as the gunman, although these identifications were somewhat equivocal.[2] According to these witnesses, Virginia had just gotten out of the SUV when the gunman, without saying a word, bent down on one knee, took aim and shot Virginia in the head. The gunman did not try to grab Virginia or take anything from her or from the car. The driver did not get out of the SUV until after the shooting had taken place.

Virginia died at the scene. The first police officers to respond found Alvarez calm and quiet, sitting on the bumper of the green SUV. He said he had driven into the restaurant parking lot, exited the SUV, heard a gunshot, then went around the SUV and saw his wife on the ground. The police found blood spatter and brain matter on the side, roof and hood of the SUV. Virginia's purse, which contained $33 as well as credit cards, was lying at her feet. There was a diamond ring on her hand.

c. *Post-shooting evidence.*

Marco Arrellano testified that in the 1980s and 1990s he belonged to the Avenues gang. He had known Sepulveda, Alvarez and Alvarez's brother Jimmy for many years. On the day of Virginia's murder, Arrellano was living at 733 North Avenue 66, about 10 blocks from the Villa Sombrero restaurant. In 2008 he told police that, at some point during the July 4th weekend in 2003, Sepulveda showed up at his house. At the time,

---

[2]     Patricia Van Cleave identified Sepulveda at the preliminary hearing and at trial. However, although she picked him out of a photo array, she refused to initial her identification because she had only viewed him from the side: "I told them that I was hesitant to say absolutely because I hadn't seen the person at the crime scene head on, I had seen him from the side, but . . . the way he looked in that picture was . . . so close to how I saw him in the profile that I was able to say I think that could be [him]." Although Michael Beckman initially testified at trial that Sepulveda was the gunman, he soon retreated and said he was "Not positive, no" in his identification. Beckman also qualified his pretrial  photo array identification, testifying:  "Yes, I said that I'm not positive, but if I had to pick one I choose . . . the most similar. I didn't do a positive identification." Mary Prisant's identification was so equivocal she was only called by the defense.

there were helicopters hovering near the Villa Sombrero restaurant. Sepulveda asked Arrellano if he could hide a gun at Arrellano's house.[3]

When Sepulveda returned to the barbeque after stopping at Arrellano's house, Sandra Hernandez became suspicious because she noticed his face was all red. She followed him into the house and overheard him say to someone on the phone either "I did it. Now Hopper has to help me clean the mess," or "Hopper, you have to help me clean the mess." "Hopper" was Alvarez's younger brother, Jimmy. In 2006, Sandra overheard Sepulveda tell someone Alvarez had offered him $20,000 to $30,000 to murder his wife and that Alvarez still owed him the money. Another time, Sandra heard Sepulveda say, "[Y]ou want me to kill Jennifer?" Sandra warned Barreau about this because Barreau's first name was Jennifer. Sandra also overheard Sepulveda say something about "the gun got shredded up."

Commenting on the clothes Virginia had been wearing the night she was shot, her sister Ruby Contreras testified she found it odd Virginia "would wear something like that knowing that she was going to be in L.A." Ruby thought Virginia was "too dressed up" to go for dinner in Highland Park, "especially at a little mom and pop type restaurant, she would never dress like that."

A little less than a year after the shooting, Sepulveda told Vince Hernandez he had shot a woman. Sepulveda said "he shot her with a shotgun" and "she like flew back." Vince testified he immediately cut Sepulveda off, saying he didn't want to hear about it.

In 2007, Alvarez and his brother Jimmy had a conversation about Virginia's murder. When Jimmy said he had heard Alvarez was involved, Alvarez did not deny it. He apologized to Jimmy and said he didn't "know why he did what he did, but that she was taking everything." Jimmy contacted the police in April 2008 about Alvarez's

---

[3]     Arrellano said Sepulveda asked to hide a "strap," which Arrellano assumed meant a pistol.

confession. He agreed to wear a wire and record their future conversations, but Alvarez refused to speak to him again.

Alvarez benefitted financially from Virginia's death in various ways. He received $8,600 from a class-action settlement that would have gone to Virginia. He received about $40,000 as his share of Virginia's estate. He received survivor benefits from Virginia's county pension plan in the amount of $1,175 a month; these payments stopped in April 2010 after Alvarez had received a total of $92,272. He also received $926 a month in survivor benefits from Virginia's life insurance policy; these payments stopped in 2009 after Alvarez had received more than $77,000.

Benjamin Garcia testified he knew Virginia from the Sheriff's Department Internal Affairs Bureau where they both worked. The week before Virginia was killed, he had recommended the El Prieto restaurant in Rancho Cucamonga to her. Garcia testified he had never heard of the Villa Sombrero restaurant in Highland Park.

Detective Tennelle was one of the primary investigators in this case. Between 2003 and 2008 he did not have any contact with Alvarez, who never made inquiries about the case. Tennelle interviewed Alvarez on September 25, 2008. Alvarez said he had been in the act of locking the SUV door from the outside when he heard the gun go off. He went around the front of the SUV and found Virginia on the ground. Asked the name of the restaurant where the shooting occurred, Alvarez said it was the Green Burrito. Alvarez said he had never been to this restaurant before and that Virginia had chosen it. Alvarez denied there had ever been a plan to go to a restaurant in Rancho Cucamonga that night. Alvarez also said he did not know anyone named Joseph Sepulveda or Pee Wee, and that he did not recognize a photograph of Sepulveda.

2. *Defense evidence.*

Neither Alvarez nor Sepulveda testified.

Mary Prisant testified she had gone to dinner at the Villa Sombrero restaurant that night with Michael Beckman and Patricia Van Cleave. In the parking lot after dinner, Prisant had been trailing behind the others. When she heard a gunshot, she turned and saw her friends running toward her. Prisant saw a man holding a sawed-off shotgun.

7

Prisant ran back toward the restaurant and a car drove past her; the gunman was driving and there was another man in the front passenger seat.

Shown a photo array five years after the shooting, Prisant picked out Sepulveda's photograph as a possibility, but did so because he had a similar haircut and skin color to the gunman and the other photographs had no resemblance to the gunman.

## CONTENTS

1. The trial court erred by excluding testimony under the marital testimonial privilege.

2. The trial court erred by admitting evidence of Sepulveda's extra-judicial statements.

3. The trial court erred by admitting evidence of a handwritten note found in Virginia's purse.

4. Defendants were denied effective assistance because counsel did not object to testimony about a change in beneficiary to Virginia's life insurance policy.

5. The trial court erred by admitting evidence of Alvarez's 2008 police statement.

6. The trial court erred by excluding testimony about eyewitness identifications from a defense expert.

7. The trial court erred by denying Alvarez's request to discharge his retained counsel.

8. The trial court erred by awarding restitution to Virginia's estate.

9. The trial court erred by awarding restitution to Virginia's mother.

10. There are clerical errors in the abstracts of judgment and minute orders.

11. The trial court did not properly calculate Alvarez's presentence custody credits.

## DISCUSSION

1. *Marital communications privilege was not improperly used to exclude exculpatory evidence.*

Defendants contend their convictions must be reversed because the trial court erroneously applied the marital communications privilege (Evid. Code, § 980) to exclude

8

evidence that would have proved Jimmy lied about Alvarez's having confessed. This claim is meritless.

        a. *Background*.

Jimmy testified to a conversation during which Alvarez admitted to having been involved in Virginia's murder. Jimmy's ex-wife, Wendy, told a defense investigator about a conversation she had with Jimmy before he reported Alvarez's confession to the police. The investigator's report stated: "Just before Jimmy got LAPD involved, he tried out stories on [Wendy] of [Alvarez] breaking down months prior and admitting his involvement in the murder. She did not believe him. She stated she challenged Jimmy on the stories, and as such Jimmy never mentioned them to LAPD detectives. [¶] Jimmy spoke to her of contacting the police and had indicated there was $50K or $60K in reward money offered. Jimmy went on to talk about what they would do with the reward money. She said; 'Jimmy already had it spent'. She was clear that she believes Jimmy was trying to find a way to get even with [Alvarez] and get the reward money for putting him away."

The prosecution filed a motion to exclude evidence of any confidential communications between Jimmy and Wendy pursuant to Evidence Code section 980 (confidential marital communication privilege). Alvarez opposed the motion, asserting Wendy's testimony was admissible under the crime-fraud exception to the marital privilege (Evid. Code, § 981). Alvarez argued the purpose of Jimmy's conversation with Wendy had been to concoct a plausible story so the police would believe his lie that Alvarez had confessed to Virginia's murder.

        b. *Legal principles.*

Evidence Code section 980 provides, in pertinent part: "Subject to Section 912 [waiver of privilege by disclosure] and except as otherwise provided in this article, a spouse . . . whether or not a party, has a privilege during the marital relationship and afterwards to refuse to disclose, and to prevent another from disclosing, a communication if he claims the privilege and the communication was made in confidence between him and the other spouse while they were husband and wife."

9

Evidence Code section 917, subdivision (a), provides: "(a) If a privilege is claimed on the ground that the matter sought to be disclosed is a communication made in confidence in the course of the lawyer-client, physician-patient, psychotherapist-patient, clergy-penitent, husband-wife, sexual assault counselor-victim, or domestic violence counselor-victim relationship, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish that the communication was not confidential."

"As a general matter, the claimant of the confidential marital communication privilege has the burden to prove, by a preponderance of the evidence, the facts necessary to sustain the claim. [Citation.] He is aided by a presumption that a marital communication was made in confidence. [Citation.] The opponent has the burden to prove otherwise [citation] by a preponderance of the evidence [citation]." (*People v. Mickey* (1991) 54 Cal.3d 612, 655.) "[A] ruling on a motion . . . [to exclude evidence under Evidence Code section 980], which concerns the admissibility of evidence, is subject to review for abuse of discretion. [Citation.] The underlying determinations, of course, are scrutinized in accordance with their character as purely legal, purely factual, or mixed." (*Id*. at p. 654.)

c. *Discussion*.

We conclude there was no prejudicial trial error for two reasons. First, we do not believe the trial court abused its discretion by excluding this evidence. Second, even if it did, it is clear the excluded evidence would not have made any difference to the trial's outcome.

(1) *The evidence was properly excluded*.

Defendants make a series of claims intended to demonstrate the marital communications privilege was inapplicable in this situation. We disagree.

(a) *The crime-fraud exception did not apply*.

Evidence Code section 981 provides: "There is no privilege under this article [Article 5, Privilege for Confidential Marital Communications] if the communication was made, in whole or in part, to enable or aid anyone to commit or plan to commit a crime or

10

a fraud." Defendants argue this crime-fraud exception was applicable because the investigator's report showed Jimmy had enlisted Wendy's assistance in fabricating a convincing lie to tell the police. Alvarez asserts: "The most compelling evidence of this is the fact that when [Wendy] critiqued his stories, [Jimmy] decided not to use any of them when he ultimately went to the police to falsely accuse Alvarez."

But under the defense theory, the only thing Jimmy "decided not to use" was the apparently fictitious framing narrative suggesting Alvarez had suffered an emotional breakdown, which led him to admit his role in Virginia's murder. Jimmy still told the police Alvarez had confessed to him, and defendants cite no evidence whatsoever proving Jimmy invented this confession. The most Wendy told the investigator was that she believed Alvarez was innocent and incapable of having committed the murder, that Jimmy had ulterior reasons for lying, and that after "she challenged Jimmy on the stories . . . Jimmy never mentioned them to LAPD detectives." Since Jimmy obviously repeated Alvarez's confession to the police, this only shows he decided to forego the part about Alvarez's breaking down emotionally.

Contrary to defendants' suggestion that Jimmy's willingness to invent a framing narrative demonstrates he must have been lying about the confession itself, the record indicates Jimmy had a reason for wanting to hide what actually triggered Alvarez's confession.

At the preliminary hearing, Jimmy testified the confession conversation came about when he told Alvarez the Avenues gang was unhappy about Alvarez's involvement in Virginia's murder and had sent Jimmy "a message . . . to deal with my brother . . . . otherwise they would deal with both of us." Jimmy explained the gang believed Alvarez had broken their rules by killing Virginia, and was notifying Jimmy he had "to deal with [his] brother or there will be . . . a green light put on both of [them] . . . ." Jimmy testified a "green light" meant "people are welcome to hurt you or something to that effect."

11

Because Jimmy, Sepulveda and Arrellano had apparently been, to one extent or another, connected to the Avenues gang, the trial court excluded all gang evidence because Virginia's killing did not appear to have been gang-related.[4] The prosecutor raised a potential problem, explaining that Jimmy had "brought to my attention that it's difficult for him to explain why it is that he confronted his brother about these accusations without saying . . . the Avenues [gang] wanted me to take care of it or they were going to issue a green light. I told him don't talk about that. [¶] My feeling is that if [defense counsel] is suggesting that Jimmy has motives that relate to a reward . . . he can certainly ask [Jimmy], were you seeking a reward? Isn't it true that that's what you were after the whole time? But then I should be permitted to say, is there another reason that you went forward to the police . . . that you were feeling pressure from another entity? Otherwise, it . . . leaves the jury with the false impression that he was after the money solely and he didn't have any other pressure."

The trial court expressed sympathy for the prosecution's position: "My thought is the defense examines on the issue of motivation at their peril. I mean, if you're going to get into a situation where the People have a different explanation, and Jimmy . . . told us at the preliminary hearing what his motivation was, then I think I've got to, in fairness, probably let the People get into it." The court suggested defense counsel attack Jimmy's credibility by asking him about the reward and his bad relationship with Alvarez,[5]

---

[4]     The trial court said: "I have made my ruling because I thought that this was not really a gang case. I understood the People's argument that because Mr. Sepulveda may have had some tangential or actual association with the Avenues was one of the reasons that Mr. Gustavo Alvarez may have reached out to him to assist in this matter, but I felt that it injected an unnecessary issue into the case and that's why I ruled as I did."

[5]     Jimmy acknowledged he and Alvarez had personal problems. In 2007, Jimmy invited Alvarez to live in the house Jimmy was renting from their sister, Celia. A few months after moving in, Alvarez wanted his girlfriend to move in, but Jimmy objected. An argument ensued. Jimmy kicked Alvarez off the property and piled his belongings in the driveway. Alvarez later sued Celia for wrongful eviction.

"[b]ut if you get into why did you confront him that day about this event, then I think he's got an answer that you're not going to want to hear even if you feel he did it for some other reason."

We conclude the defendants have failed to show the crime-fraud exception applied in these circumstances. The purported fraud[6] would have been falsely telling the police Alvarez had confessed so Jimmy could both exact revenge, by getting Alvarez in trouble with the law, and enrich himself by gaining the reward money. But defendants never showed any such crime or fraud had been planned. For instance, defendants do not allege Jimmy admitted to Wendy he had invented Alvarez's confession. As we said in *Geilim v. Superior Court* (1991) 234 Cal.App.3d 166, 174, a case involving the attorney-client privilege: "[T]he *proponent* of the exception bears the burden of proof of the existence of crime or fraud." (Accord, *Camp v. Jeffer, Mangels, Butler & Marmaro* (1995) 35 Cal.App.4th 620, 640-641].)

### (b) *There was no waiver by intended partial disclosure*.

Defendants contend the marital communications privilege did not apply because Jimmy always intended to make a partial disclosure to the police. This claim is meritless.

" 'To make a communication "in confidence," one must intend nondisclosure . . . .' [Citation.] 'While a communication between a husband and wife is presumed to be confidential, if the facts show that the communication was not intended to be kept in confidence, the communication is not privileged.' [Citation.]" (*People v. Cleveland* (2004) 32 Cal.4th 704, 744.) Alvarez asserts there was an intended partial disclosure because "Jimmy's very purpose in enlisting Wendy's aid in furtherance of the intended crime was to settle upon a story that was plausible enough that the police would believe it. Thus, at the time Jimmy spoke with Wendy, *he intended to disclose one version* – a significant part – of the conversation to the police." (Italics added.)

---

[6] Alvarez cites sections 148.5 (making false report to police of criminal offense) and 487 (grand theft [of the reward money]).

13

Alvarez argues "[t]he very purpose of the communication was to select one of the versions based on Wendy's critique."

We disagree. Although, Jimmy's intention according to Wendy was to find the most plausible framing narrative, it must also have been his intention not to disclose *any* of the possible choices if Wendy trashed them all, which is just what happened according to Wendy: the investigator's report states that after Wendy challenged all of Jimmy's proposed scenarios he did not mention any of them to the police.

(c) *There was no waiver by actual disclosure.*

Defendants contend the marital communications privilege was waived under Evidence Code section 912, subdivision (a), which provides in pertinent part: "Except as otherwise provided in this section, the right of any person to claim a privilege provided by Section . . . 980 (privilege for confidential marital communications) . . . is waived with respect to a communication protected by the privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication . . . ."

Defense counsel told the trial court that when Jimmy reported Alvarez's confession he told detective Tennelle, "[B]efore I came in here I thought about making up some stuff, but I'm ready to kind of come clean and tell you." Alvarez argues this demonstrates Jimmy himself disclosed that he had fabricated the alleged confession. Not so. If this happened, it only showed Jimmy tried to fabricate a framing narrative, not the truth of the confession itself. Moreover, as the Attorney General points out, "appellants could have cross-examined Jimmy about his thoughts of fabricating a story without violating the marital communication privilege. Had Jimmy denied such thoughts, appellants could have impeached Jimmy with evidence that he made such statements to Detective Tennelle."

(d) *A communication subject to the privilege was at issue.*

Defendants contends Evidence Code section 980 was inapplicable because "trying out stories" on Wendy was not technically a communication but only an observation of physical facts, something not protected by the marital communications privilege. We cannot agree.

14

Certainly there is a distinction between the fact a communication occurred and the content of that communication. (See, e.g., *Tanzola v. De Rita* (1955) 45 Cal.2d 1, 6 [written contents of bank check and how husband presented it to his wife were not "communications" within marital privilege: "the fact of communicating, as distinguished from the substance thereof, does not fall within the privilege"]; *People v. Saidi-Tabatabai* (1970) 7 Cal.App.3d 981, 986 [no violation of marital privilege for husband to identify wife's handwriting because "point sought to be shown by the communications . . . was the act of communicating and not the nature or character of the communications themselves"].)

But as the Attorney General points out, here the defendants "sought to introduce the *substance* of the communication between Jimmy and Wendy, i.e., that Jimmy told Wendy various stories about appellant Alvarez breaking down and admitting his involvement, and that Wendy challenged these stories. [Defendants] did not merely seek to establish that a conversation took place. Nor did they seek to introduce Wendy's observations of physical facts she observed." The defense theory was that Jimmy had been getting Wendy's help in coming up with a plausible framing narrative; the mere fact he was conversing with her is immaterial.

### (e) *Defendants did not object that Jimmy never invoked the privilege.*

Defendants contend the marital communications privilege did not apply because Jimmy neither personally invoked it, nor authorized the prosecution to do so. The Attorney General counters that defendants never raised this issue in the trial court and, had they done so, the problem could have been easily corrected. We agree with the Attorney General.

As the Attorney General explains, "When viewed in context, appellant Alvarez's trial counsel's comments were insufficient to alert the court to his current theory that the privilege did not apply because Jimmy did not assert the privilege. Rather . . . counsel was merely pointing out that the prosecutor was likely the person who advised Jimmy that such a privilege existed. . . . But . . . counsel did not suggest, as he does now, that

15

the privilege did not apply because Jimmy was not the one to assert it. To the contrary, it appears that . . . counsel assumed that after discussing the matter with the prosecutor, Jimmy was in fact asserting the privilege."

Alvarez argues the record shows he "specifically addressed the fact that Jimmy never claimed the privilege." We disagree. Alvarez cites the following trial comments by defense counsel: ". . . I don't think . . . Jimmy Alvarez came forward with this information saying, hey, I'm claiming privilege if counsel asks me these questions." But the very next words uttered by defense counsel were: "*I think this was discussed and the fact that . . . the People can plant this privilege idea* – again, I'm not accusing the People of doing this, but it's basically stopping the defendant of being able to properly cross-examine this witness." (Italics added.) It is fairly clear defense counsel was suggesting the prosecution had spoken to Jimmy about invoking the marital communications privilege. Thus, if anything, the record thus shows Alvarez objected that the prosecution had instigated Jimmy, behind the scenes, to invoke the privilege, not that the privilege was inapplicable because Jimmy neither asserted it nor authorized the prosecution to assert it.

### 1) *There was no federal constitutional error.*

Defendants contend the exclusion of this evidence violated the Sixth and Fourteenth Amendments by interfering with the right to confront and cross-examine witnesses. Alvarez argues: "Without this evidentiary bombshell, the case against [him] was entirely or almost entirely circumstantial. It was therefore of the utmost importance to Alvarez to impeach Jimmy's credibility, not merely by showing that he was a sketchy character or that he disliked Alvarez, but by revealing that his story to the police was in fact a lie. Wendy's testimony would have provided this evidence, thereby destroying the value of the purported 'confession,' and compelling a juror to rely solely on the equivocal circumstantial evidence if he or she wanted to argue for a guilty verdict." Alvarez insists "Wendy's testimony would have been devastating because it went directly to that point, which was the entire purpose of Jimmy's testimony: He fabricated a plausible story about Alvarez's confession."

16

We do not agree. There was no interference with defendants' ability to challenge Jimmy's credibility because they would have been free to cross-examine him about telling Detective Tennelle he had considered fabricating a framing narrative, but then decided against it. In any event, Wendy's testimony would have done nothing more than reveal Jimmy's search for a plausible framing narrative, along with Wendy's personal opinion Alvarez was incapable of killing Virginia. This evidence would not have demonstrated Jimmy invented the confession. Moreover, as we discuss *post*, the evidence in this case apart from Alvarez's confession was hardly equivocal; on the contrary, it was extremely powerful.

2) *Any error was harmless.*

Even assuming arguendo the trial court erred by excluding Wendy's testimony, we conclude the error was harmless under any standard; certainly under the *Watson*[7] test (see *People v. Von Villas* (1992) 10 Cal.App.4th 201, 268 [decision to admit or exclude evidence lies within discretion of trial court and erroneous decisions are tested under *Watson* harmless error standard]), but even under the more rigorous *Chapman*[8] test (see *Neder v. United States* (1999) 527 U.S. 1, 18 [119 S.Ct. 1827] ["Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?"]).

In the first place, Wendy's testimony would not have been significant. As noted, *ante*, Wendy would have merely testified Jimmy tried out various framing narratives on her and that she did not personally believe Alvarez was guilty of murdering Virginia. Wendy would not, based on the defense proffer, testify Jimmy said he had invented the confession. Moreover, just as Jimmy apparently had reasons to be biased against Alvarez, Wendy had reason to be biased against Jimmy. She told the investigator Jimmy was still active in the 43rd Street clique of the Avenues gang (which he denied), that he

---

[7]     *People v. Watson* (1956) 46 Cal.2d 818, 836.

[8]     *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824].

17

was "controlling and vengeful," and that she was "afraid of him." On the other hand, Wendy clearly liked Alvarez, telling the investigator that when Alvarez lived with her and Jimmy "he contributed in every way to the household. He was very generous and helped out financially whenever he could. He was generous with the kids . . . . She strongly believes [Alvarez] is incapable of what he is accused of." Wendy also said Jimmy hated Sepulveda and she accused him of "setting up [Sepulveda] as the shooter in this case" because Sepulveda "would be ill prepared to defend himself as she knows him as ignorant and a drug addict." The suggestion Jimmy had set up Sepulveda is fairly incredible given the overwhelming evidence of Sepulveda's role as the gunman.

In the second place, even without Alvarez's confession, the evidence against both defendants was extremely strong. The bystander eyewitnesses identifications of Sepulveda as the gunman, even if not particularly strong, were amply corroborated by the testimony of Barreau and by Sepulveda's own incriminating statements.

Barreau, who was his girlfriend, testified about Sepulveda directing her to the Villa Sombrero parking lot, waiting for the green SUV to arrive, getting out of Barreau's car with a shotgun, returning right after the shooting, ordering her to make a fast getaway, and then having her drive him to a friend's house where he wanted to hide the weapon. Sepulveda told his uncle he had shot a woman with a shotgun "and she flew back," which were the exact same words used by one of the bystander eyewitnesses to describe Virginia's murder.[9] Sepulveda's aunt overheard him on the phone saying Alvarez wanted him to kill Virginia, that Alvarez was going to pay him $20,000 or $30,000 for the job and, later, that Alvarez still owed him the money.

Although circumstantial, the evidence against Alvarez was also extremely strong.

---

[9]     Patricia Van Cleave testified: "Well, I looked back over at the wall . . . and I saw a person that had gotten out of a car . . . was moving pretty deliberately into an attack kind of position and it happened very quickly. His arms went up with a rifle, and as his arms went up his body was going down. And . . . then I heard a really loud . . . firecracker sound *and the victim flew back.* She had been hit." (Italics added.)

18

Alvarez and Sepulveda had known each other since growing up together in Highland Park. But in the aftermath of the shooting, Alvarez lied to the police by claiming he did not know Sepulveda.

Over the course of three police interviews, Alvarez's story was both internally inconsistent and in conflict with other evidence. A week prior to the shooting, one of Virginia's colleagues at the Sheriff's Department recommended a Mexican restaurant in Rancho Cucamonga called El Prieto. The day before the shooting, Virginia told her sister that she and Alvarez planned to go to El Prieto the following day. On the day of the shooting, however, Alvarez drove Virginia to the Villa Sombrero restaurant in Highland Park.

During his second police interview, two weeks after the shooting, Alvarez said he and Virginia originally intended to go to Rancho Cucamonga for dinner, but altered their plans because the babysitter had to leave early and Rancho Cucamonga was too far away. However, the distance from their Pico Rivera home to either restaurant was the about the same, 20 to 25 miles. Alvarez also said Virginia usually drove her SUV when they went out together, but he drove that night because he knew where he was going. Alvarez said Virginia chose Villa Sombrero based on a recommendation from Sergeant Garcia at her workplace. Garcia denied this, testifying he recommended El Prieto and that he had never heard of Villa Sombrero. At the third interview, Alvarez changed his story about the choice of restaurant, saying he did not recall any alternate plan to go to a restaurant in Rancho Cucamonga and that Virginia had to give him directions to Villa Sombrero.

The crime scene evidence did not suggest any motive for the killing other than a planned assassination. There was no evidence of an attempted robbery or carjacking, or that the shooting stemmed from an argument or a fight. The gunman simply walked up to Virginia, knelt down, shot her in the head, and then walked away. Bystander eyewitness Van Cleave testified she did not hear the gunman say "anything about any robbery or anything like that," or see him "touch or grab the victim." Bystander eyewitness Beckman neither heard anything about a robbery nor saw the gunman touch the victim. During his police interviews, Alvarez maintained he had exited the SUV

19

*before* the shooting occurred, which contradicted Beckman and Van Cleave, who said the driver was still inside the SUV when the shooting occurred. Remaining in the car, while Virginia got out and offered herself up as a target to Sepulveda, suggests Alvarez was protecting himself from accidental collateral damage, a suggestion reinforced by the evidence of Virginia's blood and brain matter found on the roof and hood of the SUV.

Alvarez's marriage had not been going well. He engaged in extra-marital affairs, and he and Virginia were almost divorced. Alvarez acknowledges he had a financial motive for killing Virginia. He downplays its significance, but we don't think a financial motive in excess of $200,000 is insignificant. Given Alvarez's various motives for killing Virginia, and the lack of any apparent independent motive whatsoever for Sepulveda's role in the murder, perhaps the single most incriminating circumstance was the sheer unlikelihood that Alvarez just happened to drive Virginia to the exact spot where Sepulveda was waiting with the shotgun.

In sum, there is simply no other reasonable explanation for Virginia's death than that Alvarez and Sepulveda conspired to murder her.

2. *Sepulveda's extra-judicial statements were properly admitted as declarations against penal interest.*

Alvarez contends his conviction must be reversed because the trial court erred by admitting evidence of Sepulveda's hearsay statements to Vince and Sandra. This claim is meritless.

a. *Legal principles.*

"In California, '[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true.' ([Evid. Code] § 1230.) The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration

20

was sufficiently reliable to warrant admission despite its hearsay character. [Citation.]" (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611.)

"To determine whether the declaration passes the required threshold of trustworthiness, a trial court 'may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.] On appeal, the trial court's determination on this issue is reviewed for abuse of discretion. [Citation.]" (*People v. Cudjo* (1993) 6 Cal.4th 585, 607; see also *People v. Lawley* (2002) 27 Cal.4th 102, 153-154 [trial court's ruling that statement is against penal interest is reviewed for abuse of discretion].) "We have recognized that, in this context, assessing trustworthiness ' "requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception." ' " (*People v. Duarte, supra*, 24 Cal.4th at p. 614.) As we have noted, although " '[t]here is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. . . . [¶] . . . [T]he most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures. [Citations.]' [Citation.]" (*People v. Cervantes* (2004) 118 Cal.App.4th 162, 175.)

b. *Discussion*.

Sepulveda's statements overheard by his aunt, to the effect that Alvarez had offered him money to kill Virginia and that Sepulveda had carried out the job but not been paid, and his statement to his uncle that he had shot a woman with a shotgun, were obviously against his penal interest. Sepulveda was unavailable as a witness because he did not testify at trial. (See *People v. Duarte, supra,* 24 Cal.4th at p. 611 [witness's invocation of Fifth Amendment right against self-incrimination establishes unavailability].) These conversations took place in entirely non-coercive situations. Sepulveda spoke from direct personal knowledge and he had no apparent reason to lie. (See *People v. Cervantes, supra,* 118 Cal.App.4th at p. 175 [most reliable circumstance is where conversation occurs between friends in noncoercive setting].) Alvarez argues

21

Sepulveda's pre-murder statement to his uncle that Alvarez was looking for a hitman did not qualify under Evidence Code section 1230 because "[i]t is not against penal interest to hear someone's offer to commit a crime and to reject it." But the evidence showed Sepulveda did not reject Alvarez's offer.[10]

Alvarez argues his confrontation clause rights were infringed because this evidence violated the rule of *Aranda-Bruton*,[11] which holds: "A criminal defendant has a right, guaranteed by the confrontation clause of the Sixth Amendment to the United States Constitution, to confront adverse witnesses. The right to confrontation includes the right to cross-examination. [Citation.] A problem arises when a codefendant's confession implicating the defendant is introduced into evidence at their joint trial. If the declarant codefendant invokes the Fifth Amendment right against self-incrimination and declines to testify, the implicated defendant is unable to cross-examine the declarant codefendant regarding the content of the confession." (*People v. Lewis* (2008) 43 Cal.4th 415, 453, disapproved on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919.)

But current law holds that *Aranda-Bruton* does not apply to non-testimonial extra-judicial statements. Defendants cite *People v. Garcia* (2008) 168 Cal.App.4th 261, 282, fn. 12, for the proposition that "[w]hether the *Aranda/Bruton* rule applies only to extrajudicial *testimonial* statements appears to be an unsettled question." However, "since *People v. Garcia*'s observation, a number of federal courts have expressly held that the *Bruton* rule does not apply to nontestimonial statements." (*People v. Arceo* (2011) 195 Cal.App.4th 556, 574.) Sepulveda's statements were nontestimonial because

---

**10** Even if, in some technical sense, this statement was not against Sepulveda's penal interest when uttered, because at that moment he had not yet decided to accept the offer, admitting it would have been harmless error given the proper admission of Sepulveda's post-murder statements that he had been asked to do the job by Alvarez, had carried it out by shooting a woman with a shotgun, and had not been paid as promised.

**11** *Bruton v. United States* (1968) 391 U.S. 123 [88 S.Ct. 1620]; *People v. Aranda* (1965) 63 Cal.2d 518.

they were made either to his aunt and uncle, or overheard by them while speaking in their home to other people.  (Cf. *People v. Cervantes*, *supra*, 118 Cal.App.4th at pp. 173-174 [codefendant's statements to long-time friend were nontestimonial].)[12]

The admission of this evidence does not require a reversal of Alvarez's conviction.

3. *Admission of handwritten note in Virginia's purse does not require reversal*.

Defendants contend their convictions must be reversed because the trial court erred by admitting evidence of a handwritten note which had been found in Virginia's purse when she was murdered.  This claim is meritless.

a. *Background*.

The prosecution wanted to put into evidence a handwritten scrap of paper found inside Virginia's purse, and tucked into her day-planner, when she was shot.  The paper had "Change Beneficiary" written at the top and it contained an apparent list of telephone numbers, followed by short notes which said things like "don't need to change already have mom" and "already have mom – he can get my retirement for the 4 years we were married."  (People's exh. 79)  At the bottom of the paper was written:  "Contact tax person  Change W2."

Defendants argued this scrap of paper was irrelevant because it was undated, there was no evidence showing when or why it had been written, and there was no evidence Alvarez knew it existed.  The prosecutor argued it was relevant as "a statement of her intent to financially disassociate herself with him, something that he became aware of during the course of the divorce. . . .  And she took a step by writing down a statement of her future intent, which was to extricate him from financially benefiting if her death occurred."  About a month before she died, Virginia told her sister Ruby "she had removed [Alvarez] from the life insurance and that she was afraid he would find out."  Noting this testimony, the prosecutor argued Virginia "through her sister, expressed an

---

[12]     For the same reason, Alvarez's claim the trial court should have granted his severance motion is meritless.

23

intent to change her financial situation, and she herself by writing this down and carrying it with her until the instant that she was murdered, she demonstrated an intent to distance her finances from Mr. Alvarez."

The trial court reasoned the defense arguments went more to weight than to admissibility, that the document was circumstantial evidence of Virginia's state of mind and, because they were living together, Alvarez may have suspected she would change beneficiaries because she intended to terminate their relationship. The trial court pointed out that, although it was unknown when Virginia wrote the note, "since it was found on her person . . . that lays a certain foundation for it." "I will allow it on balance. I think the statement about he can get my retirement for the four years we were married shows at least at some point that was a concern of hers and she at least nailed that down, that that was what he was going to get."

b. *Discussion*.

Alvarez argues this "scrap of paper in which Virginia wrote a reminder to 'change beneficiary' . . . . was manifestly written in 2001 at the time of the divorce, and had nothing to do with 'changing the beneficiary' in 2003 at the time of the murder, which the prosecutor insinuated was the trigger for Alvarez to act before he was deprived of the benefits he was expecting. The paper was therefore irrelevant to any disputed issue because it revealed nothing about Virginia's state of mind during the relevant time period." But as the trial court pointed out, Ruby testified that shortly before her death Virginia said she had removed Alvarez from the her insurance and she was afraid he would find out.

Alvarez also cites *People v. Riccardi* (2012) 54 Cal.4th 758, a case decided after the trial here. *Riccardi* held: "[E]vidence of the decedent's state of mind, offered under Evidence Code section 1250, can be relevant to a defendant's motive – but only if there is independent, admissible evidence that the defendant was aware of the decedent's state of mind before the crime and may have been motivated by it. [Citations.]" (*Id.* at p. 820.) A "victim's fearful state of mind concerning the defendant explains in part why a victim may not wish to reconcile, and the defendant's knowledge of that rejection may have a

24

deleterious effect on the relationship that can be relevant to a defendant's subsequent actions and motive." (*Id.* at p. 819.)

Alvarez argues that "here the evidence only showed Virginia had told Ruby that Alvarez had not discovered the change in beneficiaries." He also argues: "[W]ithout a showing that Virginia harbored that state of mind after her reconciliation, as opposed to when she was preparing for the divorce, it had no relevance to any disputed issue." "Alvarez has never argued that his financial motive was irrelevant. As noted above, it may be assumed that he knew in general about Virginia's benefits. The scrap of paper, however, was relevant only insofar as it provided an impetus for Alvarez to carry out the crime before Virginia could effectuate her intent to change beneficiaries."

But as the Attorney General argues: "The fact that Virginia continued to possess this piece of paper in her day planner, which reflected an intention to make her mother, as opposed to her husband, the primary beneficiary of her financial accounts, was circumstantial evidence that her marriage to appellant Alvarez was troubled. . . . [¶] [E]ven if the writings were made in 2001 the evidence still had probative value. Virginia's actions in 2001, at the time divorce proceedings were initiated were highly relevant. It was the People's theory that Virginia's actions during the course of the 2001 divorce proceedings, i.e., seeking to maximize her share of the community property and causing the divorce to turn from amicable to bitterly contested, ultimately provided appellant Alvarez with a motive to kill Virginia." Moreover, Ruby's testimony established that, well into the reconciliation period, Virginia had concerns about her financial connection to Alvarez.

The trial court concluded the points raised by defendants went to the weight of this evidence, not its admissibility, while defendants argue those points did go to, and necessarily defeated, admissibility. It may be that the trial court would have ruled differently had *Riccardi* been decided earlier. However, we need not resolve this issue because, as the Attorney General argues, the disputed evidence "constituted a very minor part of the prosecution's case." Alvarez's financial motive for murdering Virginia was

25

amply shown by other evidence, and exclusion of the document found in Virginia's purse would not have changed the trial outcome.

4. *There was no ineffective assistance of counsel regarding Ruby's change of beneficiary testimony.*

Defendants contend trial counsel were ineffective for failing to object to Ruby's testimony that, two months before the murder, Virginia said she had replaced Alvarez as the beneficiary of her life insurance policy and she was afraid he would find out. Alvarez argues Ruby's testimony "was demonstrably false. The life insurance records of both American General and Cigna . . . showed that the beneficiary since 1998 was Virginia's mother, and there was no evidence whatsoever that Alvarez had *ever* been a beneficiary. The false hearsay was therefore unreliable and should have been excluded." We conclude there was no ineffective assistance of counsel.

a. *Legal principles.*

A claim of ineffective assistance of counsel has two components: " 'First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' [Citation.] [¶] To establish ineffectiveness, a 'defendant must show that counsel's representation fell below an objective standard of reasonableness.' [Citation.] To establish prejudice he 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (*Williams v. Taylor* (2000) 529 U.S. 362, 390-391 [120 S.Ct. 1495].) "[T]he burden of proof that the defendant must meet in order to establish his entitlement to relief on an ineffective-assistance claim is preponderance of the evidence." (*People v. Ledesma* (1987) 43 Cal.3d 171, 218.) An appellate court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by

26

the defendant as a result of the alleged deficiencies." (*Strickland v. Washington* (1984) 466 U.S. 668, 697 [104 S.Ct. 2052].)

b. *Discussion*.

Disputing the claim Alvarez was never a beneficiary, the Attorney General asserts: "Lynne Wagner, the representative from Cigna Insurance, was never asked whether there had ever been a change of beneficiary on Virginia's life insurance policy or accidental death policy. Nor was she asked whether appellant Alvarez had ever been named as a beneficiary. And there was no representation that People's Exhibit 58 would have reflected all beneficiaries who had ever been named on the policies." The Attorney General also argues the second prong for establishing ineffective assistance of counsel cannot be met because "the testimony about the change in beneficiary was a very minor part of the prosecution's case."

We need not decide whether counsel's performance was deficient because there was no resulting prejudice to the defense. As noted, *ante*, Alvarez's financial motive for murdering Virginia was amply shown by other evidence, and exclusion of Virginia's comment to Ruby would not have changed the trial outcome.

5. *Alvarez's 2008 police interview was properly admitted into evidence.*

Alvarez contends the trial court erred by admitting evidence of his 2008 police interview because the detectives failed to accommodate his hearing disability. This claim is meritless.

a. *Background*.

At trial, Alvarez moved to suppress his 2008 police statement because he had not been provided with either a listening device or a sign language interpreter during the interview as required by Evidence Code section 754. The trial court denied the motion, saying: "I don't think that the law required the detectives, under the circumstances, to provide him with additional or assisting aids of some kind to assist him. I just don't think that the law required it."

On appeal, Alvarez acknowledges that, although he had been given a disability discharge by the Navy on account of deafness, he is "not completely deaf" and is "able to

27

hear and carry on a conversation by using his two hearing aids." Nevertheless, he argues "there is a great difference between casual conversation and a police interrogation or courtroom proceeding in which misapprehending a word or phrase may have devastating implications." He asserts the fact he "did not need a sign-language interpreter for daily life did not mean he was not 'hearing impaired' for purposes of subdivision (k) [of Evidence Code section 754]."

Section 754 provides, in pertinent part:

"(a) As used in this section, 'individual who is deaf or hearing impaired' means an individual with a hearing loss so great as to prevent his or her understanding language spoken in a normal tone, but does not include an individual who is hearing impaired provided with, and able to fully participate in the proceedings through the use of, an assistive listening system or computer-aided transcription equipment provided pursuant to Section 54.8 of the Civil Code

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(j) Whenever a peace officer or any other person having a law enforcement or prosecutorial function in any criminal or quasi-criminal investigation or non-court proceeding questions or otherwise interviews an alleged victim or witness who demonstrates or alleges deafness or hearing impairment, a good faith effort to secure the services of an interpreter shall be made, without any unnecessary delay unless either the individual who is deaf or hearing impaired affirmatively indicates that he or she does not need or cannot use an interpreter, or an interpreter is not otherwise required by Title II of the Americans with Disabilities Act of 1990 (Public Law 101-336) and federal regulations adopted thereunder. . . .

"(k) No statement, written or oral, made by an individual who the court finds is deaf or hearing impaired in reply to a question of a peace officer . . . may be used against that individual who is deaf or hearing impaired unless the question was accurately interpreted and the statement was made knowingly, voluntarily, and intelligently and was accurately interpreted, or the court makes special findings that either the individual could

28

not have used an interpreter or an interpreter was not otherwise required by Title II of the Americans with Disabilities Act of 1990 (Public Law 101-336) and federal regulations adopted thereunder and that the statement was made knowingly, voluntarily, and intelligently."

b. *Discussion*.

Alvarez acknowledges he was using his hearing aids when he talked to the detectives in 2008. The Attorney General points out the definition of "deaf or hearing impaired" in Evidence Code section 754, subdivision (a), does not include "an individual who is hearing impaired provided with, and able to fully participate in the proceedings through the use of, an assistive listening system." The Attorney General also references a Law Review Commission Comment to section 754 which states the critical question is a person's ability to hear, even if that ability has been assisted by technology: "The court's inquiry should be directed towards the ability of the person to hear; the court should not be concerned with the means by which he might be enabled to hear. [7 Cal.L.Rev.Comm. Reports 1 (1965)]."

Without directly addressing this statutory language, Alvarez asserts: "The People observe that the underlying issue is whether Alvarez had a sufficient ability to hear, whether with or without hearing aids. *Alvarez has never argued otherwise*." (Italics added.) In this way, Alvarez concedes his claim is meritless because it is clear from the record Alvarez had no difficulty hearing and responding to the detectives during this interview. The interview was videotaped and we have examined the tape, from which it is quite clear Alvarez understood the detectives' questions and had no trouble conversing with them. Alvarez consistently gave responsive answers to their questions without any apparent difficulty.

Alvarez claims one portion of the videotape demonstrates he might not have understood a critical question about whether he knew Sepulveda because his answer was characterized as "unintelligible" in a written transcript of the interview. But this argument is specious. Not only does the context indicate Alvarez had answered "no," but the question was re-asked and Alvarez is recorded as saying he did not know Sepulveda.

29

The detectives then showed him a picture of Sepulveda and Alvarez said he did not recognize the person.[13]

Moreover, subdivision (j) of Evidence Code section 754 only requires police interviewers to try to arrange for "the services of an interpreter" if the interviewee "demonstrates or alleges deafness or hearing impairment." Alvarez did neither at this interview. And subdivision (k)'s restriction on the use of answers to police questioning only applies to "an individual who the court finds is deaf or hearing impaired."[14]

The trial court did not err by refusing to exclude evidence of Alvarez's statements during his 2008 police interview.

6. *Testimony from Sepulveda's proposed eyewitness identification expert was properly excluded.*

Sepulveda contends the trial court erred by excluding testimony from his eyewitness identification expert, Dr. Kathy Pezdek. This claim is meritless.

a. *Background*.

Sepulveda filed a pretrial motion concerning the proposed testimony of Dr. Pezdek, who would testify the photograph lineup shown to the Villa Sombrero eyewitnesses was biased against Sepulveda. Pezdek would testify Sepulveda's picture had a light-pink cast to it, which her experiments had shown made it unfairly stand out from the other photographs. In opposition, the People argued the original photograph used in the photo array did not have the same coloring as the copy of the photo given to the defense as part of discovery.

---

[13] We also note that, during a post-conviction hearing, Alvarez's defense counsel told the trial court: "I was able to communicate clearly with the defendant, as was my investigator and any other experts, all without sign language interpreters. At all times I was able to communicate with him in jail and on the telephone."

[14] We are not persuaded all these statutory definitions are somehow vitiated by the fact a sign language interpreter was appointed for Alvarez's trial.

While discussing the admissibility of this proposed testimony, the trial court remarked: "I thought it was interesting that Exhibit A [the photo analyzed by Pezdek] had a pink cast to Mr. Sepulveda in the lineup and yet Exhibit B, which the People represent is a better copy of the original, did not." The court then said it believed the eyewitness identification evidence was not going to be particularly significant: "I don't see this as an eyewitness identification case. I'm inclined not to allow eyewitness expert testimony. You've got a lot of evidence of statements. You've got Arrellano saying your client wanted to give him a strap . . . close in time, to the event. You've got the overhearers [*sic*] by the Hernandezes that implicates your client . . . . I just think that to allow eyewitness expert testimony in this situation would be likely to mislead and misdirect a jury, and I don't think it would be particularly helpful." "I think your client's involvement is substantially corroborated to the point where I don't feel comfortable allowing an eyewitness expert to come in and talk about . . . eyewitness fallibility." The trial court later commented, "The eyewitness identifications, except for Van Cleave, were weak at best."

b. *Legal principles.*

The admission of expert testimony about the problems inherent in eyewitness identifications is a matter for the trial court's discretion. (*People v. Walker* (1988) 47 Cal.3d 605, 627-628.) In an unusual case the exclusion of such evidence may constitute an abuse of discretion if " 'an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury.' [Citation.]" (*Id.* at p. 628.)

c. *Discussion.*

*People v. Jones* (2003) 30 Cal.4th 1084, 1112, affirmed a trial court ruling excluding such evidence: "Exclusion of the expert testimony is justified only if there is other evidence that substantially corroborates the eyewitness identification and gives it

31

independent reliability.  [¶]  The corroborating evidence here meets [that] standard. Kane's identification of defendant was corroborated by testimony of Muslim, Cruz, Luna, Hunt, and Burton.  It does not matter, for this purpose, that Muslim, Cruz, and Luna may have been accomplices whose testimony would require corroboration to support a conviction.  [Citation.]  Neither does it matter that all five witnesses could be impeached by proof of bias or prior inconsistent statements.  The cumulative corroborative effect of the testimony of defendant's admissions is sufficient to give independent reliability to the eyewitness identification."

The same is true here.  As the trial court noted, the eyewitness identification evidence was far from overwhelming (see footnote 2, *ante*).  On the other hand, Barreau's testimony put Sepulveda in the Villa Sombrero parking lot waiting for his friend to arrive.  When a dark green SUV arrived, Barreau described Sepulveda getting out of her car, walking over to the SUV and apparently firing his shotgun, and then frantically ordering Barreau to drive him away from the crime scene to a friend's house, where Sepulveda tried to hide the weapon.  Vince Hernandez testified Sepulveda told him he had shot a woman with a shotgun and that the woman "flew back," which was precisely the same description provided by one of the eyewitnesses.  Sandra Hernandez testified she overheard Sepulveda saying Alvarez owed him $20,000 or $30,000 for killing Virginia.  This evidence "substantially corroborates the eyewitness identification and gives it independent reliability."  (*People v. Jones, supra,* 30 Cal.4th at p. 1112.)

Hence, we conclude the trial court did not abuse its discretion by excluding Dr. Pezdek's testimony.

7.  *Trial court erred by not allowing Alvarez to discharge retained counsel at the sentencing hearing.*

Alvarez contends the trial court erred by refusing a post-trial request to discharge his retained counsel.  This claim has merit and will require a remand to the trial court for further proceedings.

32

a. *Legal principles.*

"[W]hen a criminal defendant makes a timely motion to discharge his retained attorney he should not be required to demonstrate the latter's incompetence, as long as the discharge will not result in prejudice to the defendant or in an unreasonable disruption of the orderly processes of justice." (*People v. Ortiz* (1990) 51 Cal.3d 975, 979.) "[A] court must not consider whether a defendant is indigent and will require appointment of counsel in ruling on his timely motion to discharge retained counsel. To conclude otherwise would be to ignore the value we place on allowing defendants to defend themselves as they deem best, absent prejudice to themselves or unreasonable delay in the processes of justice. Although nothing we do here affects the rule that indigent defendants do not have the right to choose a particular attorney to be appointed at public expense, there is no interest compelling us to treat an indigent defendant any differently from a nonindigent defendant when he moves to discharge his retained counsel. In light of the importance of the right to counsel of choice and the sensitive nature of the relationship between a criminal defendant and his lawyer, we must not allow a defendant's indigence to prevent him from discharging in a timely manner the retained counsel he no longer wishes to represent him. [Citation.]" (*Id.* at p. 987.)

However, "[t]he trial court, in its discretion, may deny such a motion if discharge will result in 'significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice' [citations]." (*People v. Ortiz, supra,* 51 Cal.3d at p. 983.) The *Ortiz* standard applies to discharge motions made after conviction, but before sentencing. (*People v. Munoz* (2006) 138 Cal.App.4th 860, 863.)

b. *Background.*

Three days prior to sentencing, Alvarez's trial counsel, Jeremy Karpel, filed a motion to withdraw. Karpel noted Alvarez wanted him to make a new trial motion predicated in part on ineffective assistance of counsel claims, and "[c]onsequently, these discussions have created a conflict of interest with counsel, such that counsel does not feel fair continued representation could be effectuated." Karpel also stated, "As a result

33

of the defendant's accusations against counsel, there has also been a breakdown in the communication between the defendant and counsel. Accordingly, counsel believes that he cannot properly represent the defendant further."

At the sentencing hearing, Karpel reiterated his withdrawal request and the trial court invited Alvarez to speak. Alvarez presented a handwritten letter which the trial court read into the record. The letter began, "I am requesting a *Marsden* hearing," and went on to complain Karpel had done nothing to accommodate his hearing impairment and had refused to let him testify, call witnesses, help formulate a defense, etc. The trial court then turned to Karpel for a response, saying "this is a *Marsden* hearing and I have to hear from you." Karpel proceeded to deny Alvarez's allegations, to which Alvarez retorted: "It's just not true what my attorney is saying."

The trial court then said, "All right. Well, I am viewing this as a *Marsden* hearing. I am taking guidance from the case of *People v. Smith* [(1993)] 6 Cal.4th 684 . . . which requires a court to conduct a hearing when a situation like this arises prior to a scheduled sentencing. I believe I have conducted that hearing." The trial court then ruled: "Frankly, this all reeks of sour grapes and disappointment at the jury's verdict. I do not believe that this is a situation where the court should find, and I do not find that Mr. Karpel should be removed as counsel and that new counsel should be appointed. I do not believe that there has been such a breakdown of communication between Mr. Karpel and his client, although each now is asserting the other is misrepresenting statements to the court. But we are on the eve of sentencing. This sentencing has been set for 35 days from the date of conviction. [¶] I believe that as a *Marsden* motion the evidence is insufficient to compel me to replace Mr. Karpel, and I am going to deny the motion to withdraw."

34

c. *Discussion.*

A *Marsden*[15] motion is a request for substitution of appointed counsel. " ' "When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result." ' [Citation.]" (*People v. Vines* (2011) 51 Cal.4th 830, 878.)

Here, the trial court treated Alvarez's *Ortiz* motion to discharge retained counsel as a *Marsden* motion to substitute appointed counsel. These two motions are not equivalent. While acknowledging the trial court did err, the Attorney General argues: "Nevertheless, it is clear that granting the request would have resulted in unjustified delay. Indeed, the trial court specifically stated that the request was being considered 'on the eve of sentencing' and that the sentencing date had been set for 35 days from the date of conviction . . . . Accordingly, it appears that the trial court denied the motion in part on the ground that it was untimely, and that granting the request would result in the disruption of the orderly processes of justice. The trial court's ruling was reasonable."

We disagree. The trial court's reference to the timeliness of Alvarez's motion was fleeting, there was no discussion of a delay problem, and certainly no finding that granting Alvarez's request would have disrupted the orderly process of justice. Nor do we believe the circumstances would have warranted a disruption finding. The trial court said several times it was conducting a *Marsden* hearing. The trial court expressly relied on *People v. Smith, supra,* 6 Cal.4th 684, a *Marsden* case, and the reason it refused to discharge defense counsel was its finding Alvarez was only complaining about a

---

[15]     *People v. Marsden* (1970) 2 Cal.3d 118.

35

difference in trial tactics and there had not been a breakdown in attorney/client relations. The trial court summed up its rationale by saying: "I believe that as a *Marsden* motion the evidence is insufficient to compel me to replace Mr. Karpel, and I am going to deny the motion to withdraw."

Hence, we conclude "the trial court violated defendant's Sixth Amendment right to effective assistance of counsel by denying his motion to relieve retained counsel," a finding which "mandates automatic reversal." (*People v. Munoz, supra,* 138 Cal.App.4th at p. 870.) Because Alvarez was entitled to have new counsel appointed under *Ortiz*, the appropriate remedy is to reverse and remand so he may now discharge retained counsel. "This requires a reversal of the judgment, but it does not require an automatic retrial. Once new counsel is appointed, the case shall proceed anew from the point defendant originally sought to discharge his attorney." (*Munoz,* at p. 871.)

8. *Trial court erred by ordering defendants to pay almost $700,000 to Virginia's estate as restitution.*

The trial court ordered Sepulveda and Alvarez, jointly and severally, to pay the following amounts in victim restitution: $138,921.17 to Virginia's mother, Antonia Rivera; $2,586.38 to Virginia's aunt, Carmela Matanga; and, $699,196.32 to Virginia's estate. In addition, Alvarez was separately ordered to reimburse the Restitution Fund $5000. Defendants[16] challenge various aspects of these restitution awards and the Attorney General agrees some errors were made.

a. *Background.*

At the restitution hearing, Rivera testified Virginia had been 37 years old when she was murdered. She and Alvarez had one son, I.A., who was six years old when Virginia

---

[16]    Although Alvarez will need to be resentenced as a result of our conclusion the trial court erred by not allowing him to discharge his retained counsel, Sepulveda has joined all of Alvarez's restitution claims and arguments, and therefore we will continue to reference those claims and arguments just as they are presented in the parties' appellate briefs.

died. Virginia also had a son from a previous marriage, M.C. who was 10 years old when Virginia died. M.C. had been living with Alvarez and Virginia when she was killed, with his biological father paying only $25 to $50 per month for child support. Rivera immediately began living with M.C. following Virginia's death, taking care of him from that point onward. Rivera paid $3,250 in legal fees in order to obtain guardianship of M.C. M.C.'s father paid Rivera $50 to $75 for child support each month. Rivera's out-of-pocket expenses for M.C.'s care came to $500 per month.

Although Rivera was also caring for I.A. right after Virginia's death, the following month Alvarez took I.A. and had custody of him until being arrested for Virginia's murder in January 2010. During that time, Rivera spent $6,034 in legal fees in order to obtain visitation rights to I.A. Subsequently, she spent $5,716 in legal fees to become I.A.'s legal guardian.

The prosecution provided documentation showing Virginia's net monthly salary had been $3,237.02. The trial court calculated her yearly income as $38,844 and concluded she would have worked for 18 more years.[17] Based on these figures, the trial court awarded $699,196.32 in restitution to Virginia's estate.

      b. *Legal principles.*

"In 1982, California voters passed Proposition 8, also known as The Victims' Bill of Rights. At the time this initiative was passed, victims had some access to compensation through the Restitution Fund, and trial courts had discretion to impose restitution as a condition of probation. [Citations.] Proposition 8 established the right of crime victims to receive restitution directly 'from the persons convicted of the crimes for losses they suffer.' (Cal. Const., art. I, § 28, subd. (b).)" (*People v. Giordano* (2007) 42 Cal.4th 644, 652.) "Penal Code section 1202.4 now requires restitution in every case, without respect to whether probation is granted. " (*Id*. at p. 653.) Section 1202.4,

---

[17] Virginia would have been eligible for retirement at age 55; she was 37 years old when she died.

subdivision (f), provides: "[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court."

"[T]he standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt." (*People v. Baker* (2005) 126 Cal.App.4th 463, 469.) A restitution order is reviewed for abuse of discretion. (*People v. Mearns* (2002) 97 Cal.App.4th 493, 498.) "A trial court abuses its discretion when it determines [a restitution] award amount using other than 'a rational method that could reasonably be said to make the victim whole' or when an award is arbitrary or capricious." (*People v. Draut* (1999) 73 Cal.App.4th 577, 582, italics omitted.)

c. *Trial court erred by awarding restitution to Virginia's estate.*

The trial court awarded almost $700,000 to Virginia's estate in restitution. After the restitution hearing in this case, our Supreme Court held "that for purposes of mandatory restitution provisions, the estate is not itself a 'direct victim' of a crime that caused the decedent's death." (*People v. Runyan* (2012) 54 Cal.4th 849, 853.) "For purposes of section 1202.4, a 'victim' is defined to include, among others, the actual victim's immediate surviving family [citation], as well as specified relatives of the actual victim, and present and certain former members of the victim's household, who sustained economic loss as a result of the crime [citation]. A 'victim' also includes '[a]ny corporation, business trust, *estate*, trust, partnership, association, joint venture, government, governmental subdivision, agency, or instrumentality, or any other legal or commercial entity *when that entity is a direct victim of a crime*.' [Citation.] [¶] The case law has ascribed a precise meaning to the phrase 'direct victim,' as that phrase has appeared in several restitution statutes. Thus, it is established that a statute 'permitting restitution to entities that are "direct" victims of crime [limits] restitution to "entities *against which* the [defendant's] crimes had been committed" – that is, entities that are the "immediate objects of the [defendant's] offenses." [Citation.]' " (*Id.* at p. 856.)

38

As a result, *Runyan* concluded, "the [victim's] estate is not entitled to restitution, on its own behalf, as an entity itself directly targeted and victimized by defendant's crimes." (*People v. Runyan, supra,* 54 Cal.4th at p. 857.) However, *Runyan* went on to say: "Nonetheless, we are persuaded that a deceased victim's estate may, in appropriate cases, receive restitution in a different capacity, and for a different reason. When the actual victim of a crime has died, the estate, acting in the decedent's stead, steps into the decedent's shoes to collect restitution owed *to the decedent*, but which the decedent cannot personally receive because of his or her death. Thus, a decedent's estate – or, more precisely, its executor or administrator as the decedent's personal representative – is a proper recipient, on the decedent's behalf, of restitution owed *to the decedent*, as an actual and immediate crime victim, for economic losses the decedent incurred as a result of the defendant's offenses against the decedent." (*Id.* at p. 857.)

Despite this caveat, the restitution awarded in *Runyan* was improper because, "though a decedent's personal representative is authorized to receive, on the decedent's behalf, restitution for economic losses the decedent personally incurred prior to death as an actual victim of the defendant's crime, here there were no such personal, pre-death losses." (*People v. Runyan, supra,* 54 Cal.4th at p. 867.)

The Attorney General acknowledges that, under *Runyon*, "the order granting restitution to Virginia's estate is unauthorized and should be stricken," but also asserts "the matter should be remanded for a new restitution hearing, to allow the trial court to consider whether Virginia's children should be awarded restitution, as it appears that this was the trial court's intent in awarding restitution to Virginia's estate." The Attorney General notes Virginia's children were statutory victims under section 1202.4, because they sustained a loss of future economic support as a result of her murder, and argues: "Accordingly, the matter should be remanded for a new restitution hearing addressing whether M.C. and I.A. are entitled to restitution based on their own economic loss suffered as a result of the crime in this case."

We agree a new restitution hearing is necessary because the almost $700,000 awarded to Virginia's estate was improper under *Runyon*. In determining how much of

39

that amount, if any, should be awarded to Virginia's children, the trial court should be cognizant of several factors. As defendants point out, the potential amount to be awarded cannot be all of Virginia's lost future earnings because, to paraphrase *Runyan*, her children are only entitled to restitution "for [their] own personal loss arising from the decedent's death, i.e., the deprivation of support that [they] otherwise had a right to expect from [their mother]." (*People v. Runyan, supra,* 54 Cal.4th at p. 861, italics omitted; see also *People v. Giordano, supra,* 42 Cal.4th at p. 665 ["surviving spouse's economic loss is best described as a loss of economic *support*"]; *People v. Dehle* (2008) 166 Cal.App.4th 1380, 1389 [remanding to trial court to consider if "it was appropriate to reduce [decedent's] gross income by 30 percent per year based on an estimate of his personal consumption"].) Moreover, a calculation based on Virginia's expected retirement date might be improper if her children were only entitled to support up to the age of 18. Defendants also point out the trial court should discount to present value any awards meant to compensate for the loss of future support. (See *People v. Pangan* (2013) 213 Cal.App.4th 574, 581-582.)

Hence, we will remand to the trial court for a new restitution hearing to consider compensating Virginia's children for the loss of future support.[18]

9. *Trial court did not err by awarding Rivera restitution for expenses related to her care of Virginia's children.*

Defendants contend the trial court improperly awarded Virginia's mother, Antonia Rivera, restitution to compensate her for the expenses of raising M.C. and the legal fees she spent to acquire guardianship and visitation rights as to I.A. and M.C. We conclude the trial court did not err.

Rivera was a statutory victim under section 1202.4, and the costs she incurred were the direct result of the fact defendants murdered her daughter. Defendants argue

---

[18]     Again, we point out this holding technically affects only Sepulveda because Alvarez's case is already being remanded for resentencing as a result of the trial court's *Ortiz* error.

Rivera had no legal obligation to care for the boys. But they were her grandchildren and, even if Rivera acted both to provide for their needs as well as to satisfy her own peace of mind, the restitution award was proper. (See *People v. Moore* (2009) 177 Cal.App.4th 1229, 1233 [residential burglary victim's emotional and psychological trauma, stemming from " 'lasting and lingering sense of never ultimately being safe in your own home again' " justified restitution for costs incurred to attend court proceedings]; *People v. Crisler* (2008) 165 Cal.App.4th 1503, 1509 [restitution properly awarded to non-testifying parents for lost wages and costs incurred attending defendant's trial: "It is entirely reasonable that the parents of a murder victim will attend the murder trial in an attempt to gain some measure of closure and a sense that justice has been done."]; *People v. Mearns, supra,* 97 Cal.App.4th at p. 497 [restitution properly awarded for cost of relocating to new mobilehome where victim "wanted to leave the residence where she had been raped and her son threatened" because of the " 'bad memories' "].) Alvarez concedes Rivera incurred these expenses "to prevent the emotional loss of losing contact with her grandson[s]" in the aftermath of Virginia's murder.

Sepulveda complains restitution for I.A.'s visitation-based legal fees was improper because the fees were caused by disagreements between Rivera and Alvarez regarding appropriate parenting for I.A., rather than by Sepulveda's criminal conduct. But there may be more than one cause of an injury, and had Sepulveda not participated in Virginia's murder, this dispute would have never arisen. (See *People v. Holmberg* (2011) 195 Cal.App.4th 1310, 1322 [in affirming restitution award, Court of Appeal notes defendant "ignores the fact that there can be more than one cause of injury and that multiple causes can combine to cause harm"].)

The trial court did not abuse its discretion by awarding this restitution to Rivera.

10. *Correction of clerical errors in the judgment.*

Defendants contend, and the Attorney General properly acknowledges, the abstract of judgment contains a clerical error by reflecting the imposition of parole revocation fines on both defendants. The trial court did not impose such fines.

41

Section 1202.45, subdivision (a)  provides:  "In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4.  This additional restitution fine shall be suspended unless the person's parole is revoked."

*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1185, held that where the defendant was sentenced to life without possibility of parole and an additional indeterminate life term, the trial court properly declined to impose a parole revocation fine "because the sentence does not presently allow for parole and there is no evidence it ever will."  *Oganesyan* reasoned the legislative purpose of restitution fines is to recoup "from prisoners and potentially from parolees who violate the conditions of their parole some of the costs of providing restitution to crime victims," but given there is only the slimmest chance anything would be recouped from a defendant sentenced to a term that prohibited parole, "there is no evidence the Legislature intended that its cost recoupment purposes were to apply under such an extremely limited set of circumstances."  (*Id.* at pp. 1184 & 1185.)

We will order the abstracts of judgment to be corrected.  (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185 [abstract of judgment is not judgment of conviction and does not control if different from trial court's oral judgment; it is proper and important to correct such errors in abstracts of judgment]; *In re Candelario* (1970) 3 Cal.3d 702, 705 ["It is not open to question that a court has the inherent power to correct clerical errors in its records so as to make these records reflect the true facts. . . .  The court may correct such errors on its own motion or upon the application of the parties."].)

Regarding a second clerical error, the Attorney General agrees that, with the exception of the $5,000 Alvarez was ordered to pay to the Victim's Compensation Board, all the rest of the restitution was to be paid by both defendants, jointly and severally.  The abstracts of judgment do not reflect this order for joint and several liability, and should be corrected accordingly.

42

11. *Alvarez's presentence custody credits must be recalculated.*

The Attorney General properly acknowledges Alvarez's presentence custody credits must be recalculated because the trial court failed to account for an earlier period of incarceration prior to his subsequent arrest in January 2010.

## DISPOSITION

The judgments are affirmed in part, reversed in part, and remanded for further proceedings. The defendants' murder convictions are affirmed. The trial court's decision denying defendant Alvarez's motion to relieve retained counsel at sentencing is reversed. Once new counsel is appointed, Alvarez's case shall proceed anew from the point at which he originally sought to discharge counsel. As to defendant Sepulveda, the trial court's ruling awarding restitution to Virginia's estate is reversed and the matter remanded to the trial court for further proceedings in accordance with this opinion. The clerical errors noted herein are to be corrected, and Alvarez's presentence custody credits are to be recalculated.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

CROSKEY, J.

KITCHING, J.

43